and Mr. Leitner you're up. Thank you. May it please the court and counsel, my name is Mark Leitner and I represent the plaintiffs in this case, Professor Joseph Brown, Stephanie Lossie and Lewis Weisberg. This case is about the Wisconsin legislature's effort to intimidate opponents of hunting. The story really starts in 2012 when wolf hunting was reauthorized. Professor Brown is a documentary filmmaker who was on university faculties. He was telling the story of the of the activists who are opposed to, some are opposed to hunting in general and some are just opposed to various aspects of the way the hunt is conducted in Wisconsin. And that would be Stephanie Lossie who is an example of those people. She's a member of an organization called Wolf Patrol. And Mr. Weisberg published articles, hired reporters to go into the woods and document the hunt. All the plaintiffs had interest in environmental issues and in animal rights issues. They wanted to tell the story. To tell the story you need to collect information. They went to the woods to photograph and record hunters on the hunt, various aspects of things and then present their materials to the public. And in 2015, hunters didn't like the fact that they were being a statute and that statute had been interpreted in a way that the Wisconsin Court of Appeals said didn't violate the First Amendment. There was a statute to prevent harassment of hunters while they were hunting. But the legislature at the behest of the main sponsor did take up and pass a bill that we have challenged as unconstitutional. And one thing I want to emphasize to the court is that the plaintiffs are not challenging the Hunter Harassment Statute Section 29.083 in general. The plaintiffs are challenging only what I will call subsection 2A7 of that statute, which is effectively the part of the 2016 amendment that we believe targets First Amendment protected activity. The main sponsor, yes. Mr. Leitner, in determining whether the threat of prosecution is speculative or credible, the Supreme Court in Susan B. Anthony List and Babbitt recognized whether law enforcement disavowed any intention of enforcing the provision against the proposed conduct, right? So here they seem to have made clear, the authorities have, that they do not consider the plaintiff's conduct to fall within the statutory prohibition. So why doesn't that negate any claim of an objectively well-founded fear of prosecution? The short answer, Your Honor, is that the conclusion based on the reassurances of non-prosecution, those come out of a meeting that took place in, I believe it was the middle of 2017. And it was at that meeting that certain, the Wisconsin DNR and some federal law enforcement officials, and I believe law enforcement officials from one Wisconsin county attended that meeting and said, what you plan to do, film hunters on the hunt, doesn't violate the statute. The problem with that is twofold. Number one, it doesn't encompass all of the decision makers because there are a lot of district attorneys who are not present at that meeting or part of it. But the most important reason that that reassurance really fades into nothingness is the fact that in January of 2018, Professor Brown was stopped, was detained by hunters until law enforcement arrived. Then was searched, his cameras were confiscated, his video, his stored video was confiscated, and his memory cards were confiscated. Mr. Leitner, his conduct there, he was, as I recall the facts of that, he was charged with He was never charged, Your Honor. Oh, that's right. I'm sorry. He was. But there were, I read the conduct involved there. It didn't seem, it seemed like it may have encompassed what happened in this statute, but there were multiple other statutes that he was, that supported the probable cause for either the search. I can't remember. I know there was a search warrant that was signed, but there was a litany of crimes that he had at least allegedly violated. Is that right? Well, there were a number of statutes listed in the warrant, as I recall it, Your Honor. However, I think the problem here, the deficiency is that the statute in subsection 7, especially subsection 7C, specifically targets First Amendment protected activity. And we know from this court's decision in Alvarez that- But hold on for a second. That doesn't totally address Judge Rovner's question regarding standing. And there's a second part. Let me just mention one- And I believe that is correct. It doesn't. That's just the first element. This is First Amendment activity. And we believe that- Let me ask one more thing. Let me mention one more thing to tack on to what Judge Rovner had cited the Animal Legal Defense Fund versus Kelly case from the 10th Circuit. And the state didn't respond. And I guess I'm not surprised that they didn't respond because I actually think this case favors their position. In that case, what the 10th Circuit did was they said that the conduct in which the plaintiffs were intended to engage directly violated the statute. And here, your whatsoever to violate the statute. And I understand your position that there's some fear in the future that some rogue prosecutor may say, well, actually, I think your conduct did violate the statute. But isn't that just fear of a future harm? I mean, isn't that exactly what the Supreme Court has said does not qualify as standing? Sure. In every case, there are some say we do not intend to do anything to violate the statute. And the state says we don't intend to apply the statute to what your client is intending to do. Isn't that it for standing? Aren't we just talking about generalized fear of future harm? We are not for several reasons, Your Honor. And the first and foremost reason stems from the seizure of Professor Brown's equipment. He suffered an actual loss. He was unable to work on his documentary film while his media were confiscated. He had the threat of prosecution hanging over his head. And the most important thing in the context of disavowal is, number one, this happened before. And the only thing that District Attorney Simono said was he will not prosecute him for what had happened in the past. There is no disavowal of future prosecution. And we have seen from the what happened surrounding the January 2018 incident, we have seen that law enforcement will, in fact, take action that interferes with First Amendment rights. That's exactly it. Mr. Leidner, excuse me. We know from Babbitt and from Susan B. Anthony List's case that plaintiffs do not have to, in essence, confess in advance that their actions are going to violate the statute as written. But what does our record show about the existence of this law actually killing activities by your clients? Well, the clients, we discussed this in a few places in the brief, and I can direct you to the specifics in the record on both Professor Brown and Stephanie Lossi. Professor Brown has said that he will not, and particularly after the event of January 2018, he will not film or record or investigate on state-owned land. He simply will not go out. And that, in his view, has deprived him of opportunities, both because he is in closer proximity or has been for a long time in closer proximity to state-owned land. There's more state county-owned land. And he is simply not going to that land. He has been reluctant to publicize the work he was doing while the prospect of a criminal charge is hanging over his head for seven months. And even now, he has restricted his activity because he doesn't want to be interrupted again, whether he's working on his film or on a follow-up to it. He does not want to subject himself to that, even if he is not ultimately prosecuted. And the fact that the state has not nor none of the district attorneys have disavowed an intent in the future to refrain, they have not given the kinds of assurances that WDNR has given. Thank you, Mr. Lawyer. Can I ask you a couple of other questions relevant to standing? You note that your clients have been repeatedly stopped and threatened with prosecution under this law. Has that all been by private hunters or by some public officials, and should the difference matter? There are, I think there are four occasions, two to four occasions that Professor Brown was approached by law enforcement officers who have cited the hunter harassment laws and asserted he is violating them. And that's at pages 64 and 65 of his deposition, which is document 16 in the record. He discusses the same thing at pages 43 and 45 of record document 16, that he has been threatened specifically by law enforcement officers with prosecution. I'm sorry, Judge. That's helpful. Thank you. But also, I wonder, this statute has a private civil remedy in it, correct? It does. Is that relevant to the standing to challenge the law because of potential chilling effects? Well, we have not focused on that, Your Honor. I certainly think that the fact that it's possible that hunters could bring their own private lawsuits for violations of what we believe is protected First Amendment activity, we think that that certainly is a danger, but it is not. The reason I mentioned is because of the Susan B. Anthony case, as I know all of us have, and one of the things that really seemed to trouble the court a good deal there was you've got political opponents or issue opponents who both want to press to the legal limit, and that kind of private remedy, like the ability to file complaints before the Ohio Electoral Commission in the Susan B. Anthony case, in essence, enables harassment, harassment of the perceived harassers, which struck me as relevant. I also wanted to ask you one other thing, at least, and that is, is there any issue here of private property rights, like those we encountered in the so-called ag-gag cases? None. This is all on either federal land, state of Wisconsin or land, or land owned by the Congress. It's all in public. One point, Your Honor, I'm sorry. If I could just ask one other question, what is the legal proximity to a hunter? That's a good question because I'm not sure. Literally, what it means is that either the hunter can see you or you can see the hunter, and that is obviously extremely broad and in almost limitless discretion to law enforcement officers, and I think that in light of, one thing I want to say about, the court talked about Babbitt a couple of times, a couple of your honors have mentioned the Babbitt case. Let me ask you a question. How is that limitless? I just don't understand that. Are you saying the statute should say within 10 feet or within 15 feet and then we should get out there with law enforcement with a tape measure? Visual or physical proximity to me seems pretty specific. What is a law enforcement officer supposed to do? How are they supposed to pass a law that would, again, what if it said 50 feet? Are we supposed to say freeze where you are, freeze, the police are going to come out and take out tape measure and they're going to look, are you 50 feet away? Visual proximity seems pretty clear to me. The short answer is that that's what the law of Helden Hill versus Colorado was upheld precisely because it contained limits like that. Does it have to? My question is, does it have to? Does it have to say within 50 feet? I mean, can you imagine where our criminal laws would go if the law would require that level of specificity? In this context, your honor, I think that specificity is required because of the fact that these activities, the statute is so clearly aimed at First Amendment protected activities. And I think that that requires greater precision. I'm not sure I agree with that either, but that's a different issue. I do want to mention, and I would like to reserve time for rebuttal, I do want to mention that the facts of the Babbitt case are very interesting and they're the court had, no one had ever threatened to enforce that law against the union. And the Supreme Court did not think that was a barrier to standing in that case. We talked a little bit about the intent requirement. The intent requirement doesn't save the statute for the reasons stated in the Babbitt case and in SBA list, but also in this decision in Hoover versus Wagner that dealt with Wisconsin law and enforcing injunctions. And in Hoover versus Wagner, this court said that an injunction against abortion protesters, when people wanted to themselves protest in support of those particular abortion protesters, those people had standing simply because they were, it was enough of a threat that they may be prosecuted for contempt, even though they disavowed any desire or purpose of trying to assist people who were violating the injunction. And this court ruled in Hoover versus Wagner that that was sufficient. That was not speculative, even despite the absence of threats or the absence of any tangible harm that happened to Professor Brown. And with that, I'd like to reserve my remaining time for rebuttal unless the court has any questions. I'm sorry, Judge Kirsch, Judge Hamill? No. Okay. All right. Then we'll go to Mr. Thompson. Mr. Thompson. Thank you, Your Honor, and may it please the court. As the court has been discussing just now, under the terms of this statute, these plaintiffs do not face any credible threat of prosecution. They are not facing any objectively reasonable chilling effect from the terms of these statute. And I think the objectively reasonable is really important in this analysis because we've heard about, excuse me, Professor Brown opting not to go out into the woods and do his filming. But the inquiry has to be on what the statute prohibits and whether in light of what that statute says, it's objectively reasonable not to go into the woods. Otherwise... Go ahead, Judge Hamill. Mr. Thompson, I want to ask you, what effect do you think the 2016 Stalking Amendment has? What conduct is covered under that statute that was not covered before the 2016 Amendment? Well, we have to keep in mind the context in which the Stalking Amendment was added. And it was... What is the answer to my question? What conduct is covered now that was not covered before the amendment? I think the Stalking Amendment gives law enforcement the tool to address conduct that in one instance might not violate the prohibition on impeding or obstructing or interference generally. But... What do you mean? So the Stalking Amendment has... It's a serial act requirement. So an event has to... An act has to happen two or more times. So... Weren't all of those acts prohibited under your reading of the pre-2016 law? I think I will grant that in practice, most acts that would be covered under the new amendment would likely be chargeable under the first amendment. Can you give me an example of one that is new? So I think the stalking context is probably the best example where someone is following a person. And if they do it once, it's not exactly clear that that person intends to impede or obstruct. But if they do it two, three, four times, then we're in... Does stalking involve physical impediments or obstruction under the terms of the Bagley decision? By the effect of Bagley and the use of impede or obstruct in the stalking provisions, yes, there is a physical component, a physical act requirement as part of the stalking provisions. And there's a physical obstruction or impediment requirement, correct? That's right. So how does taking pictures satisfy? That's exactly our point, your honor. Is that just... I understand that's your point, sir. But my problem is that your arguments on the merits seem to assume that the Bagley limits still apply. And as near as I can tell, this new law will have... The 2016 amendments have an effect. Either they have no effect or they have an effect only on First Amendment protected activity. Why am I wrong about that? Well, starting with the First Amendment protected activity, our position is obviously that because of that impede or obstruct requirement in the stalking provisions, that's necessarily not First Amendment protected activity, that there's no First Amendment protection if somebody is doing the act with the intent... The act is videotaping. Correct. So if, for example, somebody is videotaping, that doesn't insulate them against whatever an offense might be, in this case, impeding or obstructing, or if somebody is committing battery while holding a camera. Of course that's not... That's a trivial example. I'm trying to look to see what effect this amendment had other than, if you will, something to say in campaigns to... So hunters will support a candidate. Your Honor, as I said, I think in most instances, this law, or I should say acts that would be covered under the stalking amendment, would likely be reachable under the preceding law. Can you give me any example that is reached by the new amendment, but not by the old law? Um, one example that certainly came about as a result of the new amendment is the use of drones. The new law made clear that this emerging technology would... And that's Section 8, right? The plaintiffs aren't challenging that. That's right, but that was part of the amendment. I'm talking about 2A7. And there are other parts of the statute that may have had an effect of the amendments, and forgive me for not making that clear. I just want to focus on 2A7. And I will concede that in most applications, an act would likely be covered under the previous statute. However, the fact that the legislature passed a law that already... That addressed acts already covered does not make the law unconstitutional. Maybe not, but there's some room for debate about this. But let me ask it this way. Given the state's position, how would a declaration that 2A7 is unconstitutional impair any state interests? Well, I think the state has an interest in maintaining its laws on the books. I think that just as a matter of...  You know, I wouldn't want to say absolutely that law enforcement would be hindered. This, I think, does provide another useful tool for law enforcement officers. If there is an example of this type of serial conduct, that wouldn't trigger the previous provisions. So I wouldn't want to say across the board that law enforcement can do its job exactly the same if this were nullified. Yeah. The statutory amendment contains broad language, including videotaping, no matter where the alleged act occurs. So if a person followed up a hunter home, videotaped the address, the license plate, to post online, would that type of conduct fall within the language? Because it could spark a backlash, let's say, that could obstruct the hunting, their hunting. And if so, couldn't a documentary also spark a backlash that could impede or obstruct hunting activities? And can the impeding behavior be indirect, as in those examples, rather than a direct? I think Bagley suggests that the impede or obstruct has an immediate physical component, not this sort of multiple steps down the causal chain type of activity contemplated. I think that would be virtually impossible to prove as a practical matter for law enforcement. So the impeding or obstructing has been, by Bagley, narrowed to actual physical conduct that puts, for example, the person's body in the way of a hunter on his or her way to hunting, or preparing to go to the hunting site. That sort of physical impediment, not this sort of promoting of anti-hunting media. Go ahead, Your Honor, I'm sorry. No, I'm saying, Mr. Johnson-Karp, one thing I wanted to go back to Judge Hamilton's question, with respect to the prohibitions in Section 2, Section 2.7 versus Sections 1 through 6 and Section 8, was there anything before the amendment in 2016 that required two or more acts to violate the statute, specifically with provisions 1 through 6? No, no, the serial acts provision is new with the amendment. Which makes it different than provisions 1 through 6, I assume. That's right, Your Honor. I think the stalking component of it adds an additional tool for law enforcement to address conduct that in one act might not violate subs 1 through 6. But which ultimately does demonstrate an intent to impede or obstruct. So as I said, I would hesitate to say that the law is entirely overlapping. I think there could be instances where that serial acts provision covers conduct that wouldn't be covered under 1 through 6. The reason I ask that question is you're constantly referring to Section 7 as the stalking provision, and I assume you refer to it as a stalking provision because it requires a series of acts, not just one single act. That's right, and it was, the language was adopted directly from Wisconsin's stalking statute, which is part of the cross-reference as well. I can understand why the legislature might have turned there for drafting guidance, but when we're talking about First Amendment activity, let me ask you the same question. What does visual or physical proximity mean? Suppose a judge issued an injunction against anti-abortion protesters saying you've got to stay out of visual or physical proximity of people, of staff and patients. Your Honor, I think this goes to your first question as well in terms of could someone be in visual proximity and not also violate the pre-existing prohibition on impeding or obstructing because I have to emphasize that just visual proximity, of course, under Sub 7 doesn't violate the statute. We have to have the- It's an element though. Why is it not unconstitutionally vague? Because when combined with the intent to impede or obstruct, that narrows, necessarily narrows the universe of visual or physical proximity to visual or physical proximity when someone is in the way physically of the hunter, fisher, or trapper. So what is that, if somebody's physically impeding, I guess I'm still having trouble understanding what 287 added to the statute, other than a mechanism for hunters or law enforcement to intimidate protesters? Well, Your Honor, as to the intimidation, I think the record we have here really doesn't bear that out. There's been no record of an arrest, a citation, and certainly not a prosecution or a conviction of these plaintiffs or anyone doing the types of activities that they've expressed intent to do. But it looks as if they, you know, they're frozen. In other words, they're, you know, they're too afraid to continue. I think, I don't think that that's borne out in the record, Your Honor. And I think the clearest- Sure sounds like it. I think the clearest point on that is this meeting with DNR four years ago, where the plaintiff's and some of these plaintiffs met with the Department of Natural Resources about the activities that the plaintiffs wanted to engage in, this filming, this following, this photography, and the Department of Natural Resources, consistent with the statute, said, what you're doing doesn't violate the serial acts provision. And they came out of that meeting saying, our concerns have been answered. What we're doing is not illegal. That, I think, I think there's, we'd be hard-pressed to find a clearer example where there is no chill. This is the plaintiff saying, we don't feel chilled anymore. It's somebody who is not a plaintiff, right? The statement was by a non-plaintiff. However, there is evidence in the record that Mr. Coronado works closely with these plaintiffs and that I believe Ms. Lossie and Ms. Professor Brown were at that meeting as well, where their concerns were answered. But how many district attorneys are there in the state of Wisconsin? There are 72 counties. And yes, you know, there's, as opposing counsel indicated, there's no declaration from the, from each of the district attorneys of the various counties. But what we have here is the primary law enforcement agency that's in charge of enforcing this law, the Department of Natural Resources, reading the law exactly as the plain language indicates, saying that you have to have this physical act component, or we're not gonna, see a citation. We're not going to see a violation. Mr. Johnson, let me ask you, if that's your reading, if that's your reading, that a badly physical act is still necessary, then the amendment had no effect, right? And if the court were to conclude that the amendment has no effect, as I said, that doesn't make it unconstitutional. And I think the fact that it's a perhaps repetitive law does not mean that it violates the First Amendment. Let me ask you one quick question. Craig Sparks, we have his presentation in the record. Is he a DNR attorney? Is that right? He is, yes. Okay. And he said, if I read this correctly, that the stalking amendment takes the Hunter harassment statute, basically to push the constitutional limits. And the DNR just isn't really sure what it means. And they're going to have to wait for the courts to interpret, right? Is that a fair reading of his presentation to any wardens? I think that that is certainly what Mr. Sparks said. However, we have, I think, higher up statements from the regional warden, Warden Dave Zebro, and then follow-up memos from the administrative warden, Matt O'Brien, who have made clear that this statute does not reach the type of First Amendment protected conduct that the plaintiffs are claiming here. And that's what the record bears out here, that these plaintiffs have not been cited, nor has anybody, despite robust filming and debate about hunting activities in Wisconsin. Mr. Johnson-Carper, are you aware of the plaintiffs ever having expressed, I want to talk about this reasonable, objective fear. Have the plaintiffs ever, let's say we struck down 2-7. Have they ever expressed any fear of being prosecuted under 2-1 through 6 that you're aware of? Because I guess 2-7 makes it harder to prosecute, not easier to prosecute. And if they don't have a reasonably objective fear of being prosecuted from 2-1 through 6, how could their fear of being prosecuted under a serial act of 2-7 be objectively reasonable? I agree completely, Your Honor. And I think that that is a very important point to emphasize, that Sub 7 does make it more difficult. And as far as what the plaintiffs are challenging here, in the district court, I do believe that their challenge encompassed the, I think it was Sub A and B, 2A, or I'm sorry, 2A, 2 and 3. As I understand their position now, they are only challenging Sub 7, that they have abandoned any claims as to the original provisions. So if we agree with the district court that the plaintiffs lack an injury in fact, because there's no credible threat of prosecution, would that conclusion apply equally to defeat standing as to the constitutional challenges that were based on overbreadth and vagueness? Yes, Your Honor. And I think that's an important point and a point at which we depart from the district court, that because the plaintiffs haven't, the law has not been applied to them at all, they don't have an as-applied challenge. And so their only challenges are facial overbreadth and vagueness. And this standing analysis that we've discussed bars those claims and that they have not suffered injury. And I think most importantly, perhaps for standing, is the lack of redressability. What any order from this court would grant to these plaintiffs? I think they will be hard pressed to explain how a decision from this court could grant them any redress. For that we've discussed in our brief, we would ask the court to affirm judgment below. Thank you, Your Honors. Thank you. Mr. Leitner, I see one of 47. Please add two minutes to Mr. Leitner. We just gave Mr. Johnson-Karp an extra minute. And Mr. Leitner, could I ask you to answer Mr. Johnson-Karp's question? How could we, what could we say to help the plaintiffs? Absolutely. The order would direct the defendants, including all these district attorneys who have not given any assurance whatsoever that the plaintiffs will not be prosecuted in the future for this kind of activity. We know that, but what difference would it make, I think is the question. If they can just go out and apply Section 2 or Section 3, what difference would it make if we struck down Section 7? Section 7 protects your clients more so than the other provisions in the statute. It requires serial acts, not just one individual act, which is required by the other provisions of the statute. Now, let me just finish this. One other point. Section 7, in Section 7, 1, 2, and 3, 4, it provides examples of what could include serial acts of intending to interfere, such as maintaining visual or physical proximity. But those are just examples. That could be that could take those examples, you could apply them to Section 2 or Section 3, and it's only one instance. It's not a series of instances that would result in a violation of the statute. Your Honor, two things. Number one, Dr. Brown and Stephanie Lossie spend significant time when they drive around, and it would be very easy for them to commit two acts of First Amendment protected activity under 2A7C within the course of the same afternoon. So I don't think that is as useful a protection as it may appear at first blush. For example, two acts of filming in two different places would meet the literal threshold under that statute. So I do not think it imposes any great burden on an eager prosecutor or a law enforcement officer. But couldn't they just be prosecuted under 2, under Section 2.2 or 2.3, which would be a little bit easier, which a little bit easier for the prosecutor, I think, to prove one act rather than a series of acts. You know, and that is literally true, but the problem here is that subsection 2A7 in its entirety, and particularly 7C, allows the kind of thing that happened to Professor Brown, and there is nothing to prevent that. My point is, so does 2.2 and 2.3. 2.7C is just an example. It's not inclusive, it's not exclusive. In other words, it says, including any of the following. Including means including but not limited to any of the following. So if he was engaged in conduct that violated 7C, he could also be prosecuted under 2 or 3. I think, maybe I'm missing something. And what that means is that particular section, if it is really superfluous like that, then it can't be narrowly tailored to achieve any governmental objective, let alone a substantial or essential one. We have a lot of statutes that are, I mean, we have a lot of, especially in the criminal, I mean, my gosh, charging criminal statutes. We have a lot of criminal statutes that cover the same conduct. We don't just willy-nilly strike them down because we say another statute covers that same conduct. Well, the difference here is that this is specifically targeted at activities that are protected under the First Amendment as speech. Thank you. Did you have anything more you wanted to add quickly? The only, just one very brief point on intent and on the statute's intent requirement that is, in our view, it is inconsistent with SBA list and Hoover and Babbitt to treat the intent requirement as a sort of a tractor to prevent standing. But the best point on this really was made by the district court when it was talking about the intent requirement in a slightly different context, which was the First Amendment affirmative defense. And the court there, and this is pages 18 and 19 of its decision, we couldn't have summed it up better. The conduct at issue, meaning the conduct targeted by the statute, is First Amendment speech. Parentheses, observing, recording, or reporting on hunting or fishing activities, close parenthesis. But it is not exclusively that, or at least has not eliminated conduct that could be interpreted differently by a law enforcement or private citizen as intended to interfere with hunting rights. And I think this is the biggest problem with the intent requirement. It is that intent is in the eye of the beholder. And as Professor Brown himself said, he may know what he intends, but a person who is opposed to the things Professor Brown believes in may look at the very same action and find intent. And that is the problem with it, is that it is so vague and so difficult to establish. Thank you very much. Thank you, Mr. Johnson-Karp. Thank you, Mr. Leitner. And the case will be taken.